**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL
UNION 29, AFL-CIO,

               Plaintiff

               v.

ENERGY HARBOR NUCLEAR
CORPORATION,

               Defendant

NO. 2:23-cv-761

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT ENERGY HARBOR**
**NUCLEAR CORPORATION'S MOTION**
**FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiff, International Brotherhood of Electrical Workers, Local Union 29, AFL-CIO ("Local 29") is a party to a collective bargaining agreement (the "CBA") with Defendant Energy Harbor Nuclear Corp. ("Energy Harbor" or the "Company" and, collectively with Local 29, the "Parties"), in effect from October 1, 2021, through September 30, 2024. The CBA provides for the binding arbitration of disputes arising under the CBA. Energy Harbor and Local 29 are not parties to any other arbitration agreements or provisions.

In this action, Local 29 seeks to arbitrate a grievance which, by its own terms, does not stem from the CBA. Instead, Local 29's underlying grievance (the "Grievance"), and this action, seeks to arbitrate the impact of a prior arbitration award's (the "Arbitration Award") interpretation of an extraneous agreement (the "Framework Agreement"), which has since been extinguished and has no applicability to the currently negotiated CBA.

When the Parties negotiated the 2021-2024 CBA, they agreed to review all side agreements previously in effect over a period of six months and, following that period, to finalize an appendix to the CBA (the "Appendix") which would identify all side agreements that would

remain in effect during the term of the 2021-2024 CBA. The Parties also expressly agreed, and the CBA provides, that any side agreements neither incorporated in the CBA nor identified in the Appendix would be extinguished and of no further force or effect.

The Parties followed that course of action as proscribed by the CBA. Over a period of over *nine* months following ratification of the CBA, the Parties discussed and agreed on the side agreements which would remain in effect. The Parties negotiated to return to the original provisions of Article VIII and did not incorporate and of the Framework Agreement into the CBA. The Appendix also does not list the Framework Agreement or the Arbitration Award as side agreements that continue in effect either. Likewise, the CBA itself does not contain any reference to either document. Yet the grievance itself specifically references the Arbitration Award (which was clarified in the Arbitrator's subsequent Order on Local 29's motion to implement the award) as the basis for the dispute.

These undisputed facts necessarily lead to the conclusion that the Grievance does not seek to arbitrate the operation of any provision of the CBA, but instead seeks to arbitrate yet again an interpretation of the now defunct Framework Agreement. The grievance arbitration in the Parties' CBA, which is expressly limited in scope, forbids this. It is well-settled that the federal policy favoring resolution of labor disputes through arbitration gives way where the dispute is not governed by the parties' collective bargaining agreement.

Accordingly, and as set forth in greater detail herein, Local 29's claim fails as a matter of law. Energy Harbor respectfully requests that this Court grant summary judgment with respect to Local 29's sole claim.

24116143

II.     **STATEMENT OF FACTS**[1]

A.     **The Parties' Relationship and Relevant Collective Bargaining Agreement Provisions**

Local 29 is a labor organization representing a bargaining unit of employees at the Beaver Valley Power Station. (Dkt. No. 35, ¶¶ 1, 5.) Beaver Valley Power Station is a nuclear power generating plant in Beaver County, Pennsylvania, which is owned and operated by Energy Harbor. (Dkt. No. 35, ¶ 3.) A collective bargaining agreement (the "CBA") governs the Parties' relationship and Local 29's representation of the bargaining unit. (Dkt. No. 35, ¶ 5; Dkt. No. 38-1.) The current CBA is in effect from October 1, 2021, to September 30, 2024. (Dkt. No. 38-1, Art. XI.)

The CBA contains a provision requiring the filing of a grievance, and the subsequent arbitration, of certain disputes between Energy Harbor and Local 29 or bargaining unit employees. (Dkt. No. 39, ¶ 31; Dkt. No. 38-1, Art. IX, § A.) The grievance arbitration provision has an explicitly limited scope, applying only to "dispute[s] or difference[s] aris[ing] between the Company and the Union or its members as to the *interpretation, application, or operation of any provision of this Agreement*, not specifically settled in said Agreement. . . ." (*Ids.* (emphasis added.))

The CBA also provides that the Company will have in effect a Flexible Benefits Plan available to Local 29 employees, providing medical, prescription drug, dental, vision, and other benefit offerings. (Dkt. No. 38-1, Art. VIII, § C.1.) In lieu of participating in the plan offered by Energy Harbor, Local 29 employees may elect to opt out of that plan and instead participate in a separate plan sponsored by Local 29. (Dkt. No. 38-1, Art. VIII, § C.2.(a); Dkt. No. 39, ¶ 27.)

---

[1] Energy Harbor incorporates and adopts herein all facts stipulated to in the Parties' Joint Statement of Undisputed Facts (Dkt. No. 34), and all facts averred by Energy Harbor in its Concise Statement of Facts in Support of Its Motion for Summary Judgment, filed contemporaneously herewith. (Dkt. No. 39.)

24116143

When Local 29's membership elects to opt out of the Company plan, and in place of the premiums that the Company contributes on behalf of participating employees, the Company is required to make monthly contributions to the Union. (*Ids.*) In effect, the only requirement in the CBA is that opt out employees are provided the same contributions as all other employees who remained on the Company health plan. This would include any yearly increase in premiums. However, the grievance seeks to impose a different obligation than the Parties bargained for in the 2021-2024 CBA. It seeks to require the Company to pay a higher premium contribution than for all other employees—including Union employees at other locations—by applying the now extinguished Framework Agreement and an Arbitration Award that was expressly limited to 2021. The CBA sets forth the rates of those opt-out contributions effective January 1, 2014, and provides that "the Company's monthly contributions will be ***increased*** by the same percentage as any ***increase*** incurred by the Company's Health Care Plan from the previous year."  (Dkt. No. 38-1, Art. VIII, § C.2.(a) (emphases added.))

**B.**     **The Parties' December 2021 Arbitration Centered on the Framework Agreement, Not any Provision Within the CBA**

Separately and unrelated to the instant dispute, in 2021, Local 29 grieved, and the Parties subsequently arbitrated, the value of the Company's opt out contributions for 2021. (*See generally* Dkt. No. 38-6; Dkt. No. 39, ¶¶ 5-8.) The dispute central to the 2021 arbitration was not application of any provision of the then-governing CBA itself, but of the meaning of the term "the same benefits" in an Agreement Between FirstEnergy Nuclear Operating Company ("FENOC") and IBEW Locals 29 and 29MP (the "Framework Agreement"), which was reached

during bankruptcy proceedings. (Dkt. No. 38-5; Dkt. No. 38-6, 4; Dkt. No. 38-5, ¶ 5(a); Dkt. No. 39, ¶¶ 5-8.)[23]

Indeed, in the Arbitration Award, Arbitrator Sergent framed the issue as follows: "***Did the Company's actions*** relating to health care benefits for 2021 ***violate the Framework Agreement***[], and, if so, what should the remedy be?" (Dkt. No. 38-6, 4 (emphasis added); Dkt. No. 39, ¶ 5.) In fact, the section of the Arbitration Award containing Arbitrator Sergent's Discussion and Decision and addressing whether the Company's compliance with the CBA does not contain a ***single*** reference to Art. VIII, § C.2.(a) of the CBA. (Dkt. No. 38-6, 31-40.) Instead, the Arbitration Award is replete with references to the language whose application was in dispute—the Framework Agreement:

## II. THE ISSUE

> ***The parties stipulated*** to formulation of the issue as follows: ***Did the Company's actions*** relating to health care benefits for 2021 ***violate the Framework Agreements***, and, if so, what should the remedy be?
>
> ***

## IV. SUMMARY OF THE EVIDENCE

> ***
>
> [Local 29 Business Manager] Camp testified that following the bankruptcy hearing, the Court denied FENOC's plan of reorganization because of the Company's failure to agree to on [*sic*] the continuation of all benefits, and thereafter Company and the Unions resumed negotiations. As a product of those meetings, the parties eventually reached agreement on a ***"Framework***

---

[2] The predecessor CBA had an express term of October 1, 2014, through September 30, 2018. However, through several extension agreements, the predecessor CBA remained in effect until the current October 1, 2021, to September 30, 2024, CBA took effect.

[3] The Framework Agreement is a relic of predecessor FENOC's emergence from bankruptcy proceedings, and has been extinguished. Ancillary to FENOC's emergence from bankruptcy was the negotiation of the Framework Agreement, which addressed certain of the Parties' obligations and entitlements with respect to health care benefits during the CBA term upon FENOC's emergence from bankruptcy as Energy Harbor.

> *Agreement* which was signed by both the Company and Local 29
> on October 8, 2019.
>
> ***
>
> Camp stated that based on this information, the Union concluded
> that the plan design had changed from ***what was agreed to in the
> Framework Agreement*** to benefits that were lesser.
>
> ***
>
> On cross-examination, Camp agreed that ***the Framework
> Agreement*** does not state that the cost of benefits will be the same.
> He acknowledged that even under the FirstEnergy plans the cost of
> benefits changed from year to year, usually with an increase. Camp
> also agreed that ***the Framework Agreement*** provides that if the
> Union decided to opt-out, the Company will provide contributions
> on behalf of members calculated using the same methodology used
> under the current CBA.

(Dkt. No. 38-6, 4, 13-15 (emphases added.)) The testimony of Local 29 in this matter, through its

corporate representative and Business Manager Joshua Ewing, aligned with this characterization

of the 2021 arbitration:

> Q.    Okay. Read along with me as I read that. The parties
>        stipulated to formulation of the issue as follows: Did the
>        company's actions relating to healthcare benefits for 2021
>        violate the Framework Agreements, and, if so, what should
>        the remedy be? Did I read that correctly?
> **A.    Yes, sir.**
> Q.    The issue in that case was the Framework Agreement
>        interpretation. Correct?
> **A.    Yes, from my understanding, and after reading this, I
>        think it's safe to say that the main issue was stemmed
>        from the Framework Agreement.**
> Q.    Well, there's no other issued identified on that page. Right?
> **A.    No**.

(Dkt. No. 38-4, 19:10-20; 48:4-20.)

Following issuance of the Arbitration Award, Local 29 sought an extension of the award

to apply to 2022, resulting in Arbitrator Sergent's issuance of an Order on Union's Motion to

24116143

Implement the Award (the "Arbitration Order") on June 3, 2022. (Dkt. No. 38-7.) In the
Arbitration Order, Arbitrator Sergent expressly rejected the Union's request to extend the
Arbitration Award, and reiterated that the Arbitration Award (and the underlying grievance)
centered on the Framework Agreement:

> First, the Union requests that the Company be ordered to continue
> paying healthcare contributions at the 2021 rates for on-going
> violations in 2022. As support for its position, the Union insists
> that both the Local 29 and Local 270 grievances referenced
> "ongoing violations." ***According to the Union, the Company's
> contributions for 2022 remain the same as the 2021 rates
> established by the Award, which, by default, set the rates for
> 2022.*** Therefore, the Union seeks an order for the Company to
> reimburse employees the amount, with interest, that the employees
> overpaid in contributions for 2022 and pay the 2021 rates for the
> remainder of 2022.
>
> With respect to this first issue, it is undisputed that the stipulated
> issue before me at the hearing on the underlying grievances was
> "***Did the Company's actions relating to health care benefits for
> 2021 violate the Framework Agreements***, and, if so, what should
> the remedy be?" The ***Unions' acquiescence to this clear statement***
> of the issue is binding, as is the resultant limitation on my own
> jurisdiction and authority. Simply stated, ***this arbitrator has no
> authority or jurisdiction to consider what terms govern benefits
> for 2022, and I must decline to do so.***

(Dkt. No. 38-7, 1 (emphases added.); Dkt. No. 39, ¶ 9.)

C.  **The Parties Deliberately Extinguished the Framework Agreement, and the
    Arbitration Award and Arbitration Order were Never Side Agreements to
    the CBA.**

Effective October 1, 2021, the Parties reached agreement on the terms of the current
CBA. (Dkt. No. 38-4, 56:10-16.) Throughout the course of the Parties' negotiations leading up to
their ultimate agreement, the Union never proposed incorporating the Framework Agreement or
any language from it into the successor CBA. (Dkt. No. 38-4, 20:16-21:9; 22:1-16; Dkt. No. 39,
¶ 23.) The Parties instead negotiated retaining the language of Art. VIII in its original form, §

24116143

C.2.(a) of the CBA. (Dkt. No. 35, ¶ 28.) The language of that Section in the 2021-2024 CBA is

identical to the language in the predecessor CBA:

> Q.    Can we agree that there is nothing in [Article VIII], you can
>       certainly pull it back out if you need to, referencing any of
>       the language from the Framework Agreement?
> **A.    Yes, sir, I would say that's accurate.**
> Q.    And that's the contract the new contract we're talking
>       about. Right?
> **A.    Yes. As I said before, the language [in Art. VIII] hasn't
>       changed from the 2014 agreement to the current
>       Collective Bargaining Agreement.**

(Dkt. No. 38-4, 56:4-9.) Thus, the Parties followed Arbitrator Sergent's recommendation in the

Arbitration Order to "resolve it between [them]selves." (Dkt. No. 38-7.)

In addition, the Parties negotiated a zipper clause into Art. XI of the 2021-2024 CBA,

which provides that "all prior agreements, whether reduced to writing or not, including side

agreements and white paper agreements" that are neither set forth in the CBA or identified in an

appendix to the CBA are of no further force or effect as of the CBA's ratification date. (Dkt. No.

38-1, Art. XI; Dkt. No. 39, ¶ 14.) The Parties also agreed that, for a period of six months

following ratification, they would discuss all side agreements and white papers then in effect, to

identify the agreements that would remain in effect during the term of the 2021-2024 CBA, and

to identify an exhaustive list of those agreements in an appendix to the CBA. (*Ids.*)

> Q.    Okay. Now, we talked about this briefly, but let me just
>       make sure I'm clear on this. We reached a tentative
>       agreement in October of 21. Right?
> **A.    Yes, sir.**
> Q.    And there was a process put in place for the review of the
>       si[d]e agreements. Right?
> **A.    Yes, sir, I believe so.**
> Q.    And that was going to be at least six months?
> **A.    I believe there was a time frame at six months . . .**

\*\*\*

24116143

> Q.     But the process was followed and the si[d]e agreements were identified?
> **A.     Yes, sir.**
> Q.     And after that was completed, the contract was signed?
> **A.     Yes, sir, I believe that's accurate.**

(Dkt. No. 38-4, 26:15-27:14.) As a result of these negotiations, the Parties did finalize an appendix to the CBA (the "Appendix") identifying all side agreements that would remain in effect during the term of the 2021-2024 CBA. (Dkt. No. 38-4, 28:1-29:3; Dkt. No. 38-2; Dkt. No. 39, ¶ 28.) In fact, the Parties did not execute the 2021-2024 CBA until after they negotiated and finalized the Appendix:

> Q.     But the process was followed and the si[d]e agreements were identified?
> **A.     Yes, sir.**
> Q.     And after that was completed, the contract was signed?
> **A.     Yes, sir, I believe that's accurate.**
>
> ***
>
> Q.     Right, and that was agreed to in July of 2022. We already established that [the CBA] was signed in July of 2022?
> **A.     Correct, the TA was October of 21, but it wasn't signed until July, correct.**
> Q.     Because of the side agreement issue?
> **A.     Yes, sir.**

 (Dkt. No. 38-4, 27:9-14; 56:10-16.) As a consequence, the Appendix was not finalized until after both the February 3, 2022 Arbitration Award, and the June 3, 2022 Arbitration Order, had been issued. (*See* Dkt. Nos. 35-6, 35-7; Dkt. No. 39, ¶ 28.)

Nevertheless, the Appendix, which identifies a total of thirty-five side agreements continuing in effect during the term of the 2021-2024 CBA, ***does not*** include the Framework Agreement, the Arbitration Award, or the Arbitration Order. (Dkt. No. 38-2.)

> Q.     Now take a look on [the Appendix]. Is there anything on this document indicating that the Framework Agreement which we talked about in Exhibit B, is included?

> **A.** **I do not believe so, but I will review and see if I see anything.**
>
> Q. Yeah, I'm going to tell you it's not, but I want you to confirm.
>
> \*\*\*
>
> **A.** **Yeah, I confirm. I don't see anything with the framework on this listing.**
>
> \*\*\*
>
> Q. Will you agree with me that there is no reference to either of the two arbitration awards as part of the side agreements?
>
> **A.** **So you're asking me, is the framework or the arbitration award in part of this?**
>
> Q. No, we already covered the framework.
>
> **A.** **Okay.**
>
> Q. I'm asking you about the opinion and award . . . and the order on motion . . . to implement the award.
>
> **A.** **Understood. Yes, I don't believe either is on this list of side agreements.**

(Dkt. No. 38-4, 29:21-30:9; 35:16-36:4.) The Appendix also reflects that the Union did not even

propose to include the Framework Agreement, the Arbitration Award, or the Arbitration Order.

(Dkt. No. 38-2.) The Appendix contains a separate table identifying "Disputed Agreement[s]",

which does not include any of those three agreements. (*Id.*) None of the three agreements are

referenced or incorporated in Art. VIII or in any other section of the CBA, either:

> Q. Can we agree that there is nothing in [Article VIII], you can certainly pull it back out of you need to, referencing any of the language from the Framework Agreement?
>
> **A.** **Yes, sir, I would say that's accurate.**
>
> Q. And that's the contract the new contract we're talking about. Right?
>
> **A.** **Yes. As I said before, the language [in Article VIII] hasn't changed from the 2014 agreement to the current Collective Bargaining Agreement.**
>
> \*\*\*

> Q.    But none of that language --- we've already covered this.
>        None of that language was included in the new agreement.
>        Right? None of it.
> **A.    None of the framework?**
> Q.    Framework Agreement language.
> **A.    I agree that none of the framework language was in the
>        new contract, correct.**

(Dkt. No. 38-4, 55:24-56:9; 65:16-23; *see generally* Dkt. No. 38-1, *passim* (containing no

reference to the Framework Agreement, the Arbitration Award, or the Arbitration Order.))

### D.    The Instant Grievance Invokes and Relies Upon the Non-Contractual Arbitration Award, Which Interpreted Only The Framework Agreement.

On either October 14 or October 19, 2022, a third step meeting was held between Energy

Harbor and Local 29 to address the underlying Grievance. (Dkt. No. 38-3; Dkt. No. 38-4, 58:25-

59:10.) The written Grievance contains bolded headings for each section. *Id.* In relevant part, one

of the bolded headings on the grievance is captioned "**Nature of Grievance**". (*Id.*)

> Q.    Okay. Now, where it's just underneath that, it says nature
>        of grievance?
> **A.    Yes, sir.**
> Q.    And that's where the Union describes what the grievance
>        is?
> **A.    Yes, sir.**

(Dkt. No. 38-3; Dkt. No. 38-4, 59:17-23.) As the "Nature of [the] Grievance", the Grievance

alleges that:

> Energy Harbor failed to adjust the 2022 health care contributions
> by the percentage needed to satisfy ***the arbitration award FMCS
> Case No. 21022-04248*** as stated in the arbitrator's ruling. Union
> recommendation: Cease and desist, make the needed adjustments,
> make whole any lost compensations.

(Dkt. No. 38-3 (emphasis added.)) Underneath and ***outside*** of its description of the "Nature of

the Grievance", the Grievance identifies as "**Contract Ref[erences]**" two inapplicable

subsections of the CBA: Art. I, governing Representation & Recognition, and Art. VIII, §

C.2.(a). (*Id.*) In light of the fact that the Grievance seeks to arbitrate the application of the

24116143

Arbitration Award (and, by extension, the extinguished Framework Agreement), neither of which are contained in or side agreements to the CBA, and given the CBA's grievance arbitration provision which has an expressly limited scope, Energy Harbor rejected Local 29's request to proceed to arbitration. (Dkt. No. 5, ¶¶ 23-24.)

## III.     LAW AND ARGUMENT

### A.     Summary Judgment Standard.

A court shall grant summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–49 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson*, 477 U.S. at 248; *Vu v. Ski Liberty Operating Corp.,* 763 F. App'x 178, 180 (3d Cir. 2019). A "mere 'scintilla of evidence' in the non-movant's favor does not create a genuine issue of fact, and the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (internal citations omitted) (*citing Anderson*, 477 U.S. at 248).

Here, Energy Harbor requests summary judgment because no genuine issues of material fact remain as to the substantive arbitrability of the underlying Grievance. On the record, a reasonable finder of fact could reach only one conclusion: because the CBA provides for arbitration only of those disputes arising by operation of the CBA, and Local 29's grievance seeks to arbitrate application of an extra-contractual document, Energy Harbor cannot be compelled to arbitrate that dispute.

**B.    The Grievance Does Not Arise Under the CBA and is Not Substantively Arbitrable.**

This claim turns on the undisputed plain language of the documents in evidence and is ripe for summary judgment. The question before this Court is whether Local 29's Grievance is substantively arbitrable. This question is properly before this Court—the CBA does not provide for arbitral resolution of arbitrability, and "unless the parties clearly provide otherwise, the courts, not the arbitrators, are tasked with interpreting agreements in order to determine whether the parties have indeed agreed to arbitrate disputes whose arbitrability is contested." *Rite Aid of Pennsylvania, Inc. v. United Food & Com. Workers Union, Loc. 1776*, 595 F.3d 128, 131 (3d Cir. 2010). Because this dispute is not substantively arbitrable, summary judgment should be granted in Energy Habor's favor.

Initially, "[i]n order to determine whether a dispute is substantively arbitrable, a court must examine whether the subject matter of the dispute is covered by the contract's grievance and arbitration procedure." *Cascades Tissue Grp.—Pennsylvania, Inc. v. United Steel, Paper, & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 119 F. Supp. 3d 307, 312 (E.D. Pa. 2015). "Where an arbitration clause in a collective bargaining agreement limits arbitration to those disputes which require interpretation of the agreement . . . a grievance is excluded from arbitration unless it arises from a specific provision in the agreement." *Rite Aid*, 595 F.3d at 132 (affirming the lower court's judgment find that the parties had not agreed to arbitrate the topic at issue where the arbitration clause "limit[ed] arbitration to those disputes which require interpretation of the agreement" and the grievance did not constitute such a dispute). This is because "arbitration is still a creature of contract and a court cannot call for arbitration of matters outside of the scope of the arbitration clause." *United Steelworkers of Am., AFL-CIO-CLC v. Rohm & Haas Co.*, 522 F.3d 324, 332 (3d Cir. 2008).

24116143

In *Rite Aid*, the court addressed the substantive arbitrability of the union's dispute regarding the issue of union access to the employer's new stores to gather support. *Rite Aid*, 595 F.3d at 130. Rite Aid disputed arbitrability on the basis of the parties' CBA's grievance arbitration provision, which provided only for arbitration of disputes that "involve the *interpretation of any provision of this Agreement.*" *Id.* (emphasis in original). The union responded by identifying "three CBA provisions under which it purported to assert its store-access grievances"—the Recognition Clause, the Observation Clause (permitting the Union to enter the employer's establishment to ensure that the CBA was being honored), and the Privileges Clause (providing that privileges granted by the employer shall be continued). *Id.* at 130, 132-34. In spite of the union's identification of these CBA provisions, the court found that the grievances did not involve the interpretation of any CBA provisions, and that they therefore fell outside the scope of the CBA's arbitration clause. *Id.* at 131-36. The court reasoned that the arbitration provision's express limitations constituted "forceful evidence . . . that the parties intended to exclude from arbitration claims which arise wholly outside the scope of the CBA." *Id.* at 136.

The Third Circuit's analysis in *Rite Aid* is instructive. Here, as in *Rite Aid*, the arbitration clause at issue permits arbitration only of those disputes that "involve the *interpretation of any provision of this Agreement*." *Id.* at 130 (emphasis in original); *see also* Dkt. No. 38-1 at Art. IX (providing a mechanism for grievance arbitration only for "dispute[s] or difference[s] aris[ing] between the Company and the Union or its members as to the interpretation, application, or operation of any ***provision of this Agreement*** . . . .") (Emphasis added).

Further, like in *Rite Aid*, the Complaint here does not seek to force arbitration of a dispute that involves the interpretation of a provision of the CBA. In its description of the "**Nature of**

**Grievance**", Local 29 clearly sets forth the basis of its claims that Energy Harbor "failed . . . to satisfy the arbitration award FMCS Case No. 21022-04248 as stated in the arbitrator's ruling." Thus, the Grievance and Complaint call for arbitration of (and interpretation of) two documents: (1) the Arbitration Award and (2) the Framework Agreement, neither of which are of any force or effect under the applicable CBA. One document that the Grievance glaringly does not seek interpretation of is the CBA itself. That is because there is not language form the CBA at issue here. As a result, and under the plain language of the CBA, the Grievance is not substantively arbitrable.

In addition, it is of no import that Local 29, like the union in *Rite Aid*, makes passing reference to irrelevant CBAs provision at the bottom of the Grievance, after describing the nature of the grievance, in a futile effort to bring the Grievance within the purview of the CBA's grievance arbitration provision. Simply listing a CBA provision does not render the Grievance one "requir[ing] interpretation of the agreement" as required under *Rite Aid*. Indeed, one of the two provisions that Plaintiff references in its attempt to anchor the grievance to the CBA is a provision in the CBA's Art. I governing Representation & Recognition. (Dkt. No. 38-3; *see also* Dkt. No. 38-1 at Art. I(D).) The Court in *Rite Aid* rejected this precise argument, finding the union's argument that the CBA's recognition clause rendered the grievance one "involv[ing] the interpretation of any provision of this Agreement" unavailing. *Rite Aid*, 595 F.3d at 132-34. As the Court reasoned in *Rite Aid*:

> *We may not accept an arbitration proponent's citation to a particular provision of the CBA and its claim that the grievance arises thereunder without critical examination.* Unquestioning acceptance of the Union's characterization of its claims is inconsistent with our duty to determine arbitrability because it "leaves the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union."

*Id.* at 132 (emphasis added) (*citing E.M. Diagnostic Sys., Inc. v. Local 169*, 812 F.2d 91, 95 (3d Cir.1987)).

Local 29 specifically points to two CBA provisions in its Grievance: Art. I, § D, and Art. VIII, § C.2.(a). (Dkt. No. 38-3.) Initially, Art. I, § D is inapposite. That provision governs Energy Harbor's obligation to include certain information and representations "in its definitive agreements with the new owner or operator" in the event of Energy Harbor's "transfer, sale, or other disposition of its business operations or assets." Dkt. No. 38-1, Art. I, § D. That provision bears no relationship to the Grievance asserted by the Union. And insofar as the Grievance intended to point to Art. I generally, the CBA's Representation & Recognition provision, that argument is unavailing, and readily rejected with the same reasoning invoked by the Third Circuit in *Rite Aid*. *Id.* at 132-34.

The second CBA provision that Local 29 points to is Art. VIII, § C.2.(a), which governs Local 29 employees' entitlement to contributions in the event that the Union opts out of the Company's offered health insurance plan. Article VIII, § C.2.(a) requires only that the Company will make opt out contributions to the Union, on behalf of an employee opting out, equal to the amount the Company contributes as employer premiums for employees participating in the Company-sponsored plan. (Dkt. No. 38-4, 54:7-13.) The Union agrees the Company made such contributions. What is seeks to arbitrate are claimed extra-contractual obligations that do not exist.

While the Grievance makes a stray citation to Art. VIII, § C.2.(a), in reality, the Grievance does not relate to that CBA provision at all. Indeed, in its "**Nature of Grievance**", the Grievance shows its true colors: it alleges that Energy Harbor "failed . . . to satisfy the arbitration award FMCS Case No. 21022-04248 as stated in the arbitrator's ruling." (Dkt. No. 38-3.) Fatally

16

to Local 29's claim, neither the Arbitration Award, nor the Arbitration Order enforcing it, nor the Framework Agreement forming its basis, is incorporated or even **referenced** in the CBA. Mr. Ewing, on behalf of Local 29, conceded that the Arbitration Award interpreted application of the Framework Agreement.

> Q.    Okay. Read along with me as I read that. The parties stipulated to formulation of the issue as follows: Did the company's actions relating to healthcare benefits for 2021 violate the Framework Agreements, and, if so, what should the remedy be? Did I read that correctly?
> **A.    Yes, sir.**
> Q.    The issue in that case was the Framework Agreement interpretation. Correct?
> **A.    Yes, from my understanding, and after reading this, I think it's safe to say that the main issue was stemmed from the Framework Agreement.**
> Q.    Well, there's no other issued identified on that page. Right?
> **A.    No**.

(Dkt. No. 38-4, 19:10-20; 48:4-20.) The Arbitration Award speaks for itself, as does the Arbitration Order laying the outer contours of the Arbitration Award:

> [I]t is undisputed that the stipulated issue before me at the hearing on the underlying grievances was "***Did the Company's actions relating to health care benefits for 2021 violate the Framework Agreements***, and, if so, what should the remedy be?" The ***Unions' acquiescence to this clear statement*** of the issue is binding. . . .

(Dkt. No. 38-7, 1 (emphases added.)) Further, the portion of the Arbitration Award's Discussion and Decision section addressing whether the Company complied with the CBA does not contain a ***single*** reference to Art. VIII, § C.2.(a) of the CBA. *Id.* at 31-40. Application of any CBA provision was not at issue in the 2021 grievance arbitration. That dispute dealt exclusively with the interpretation of the Framework Agreement, which the Parties deliberately extinguished effective October 1, 2021.

24116143

Third Circuit precedent is instructive on this issue as well. In *Cup v. Ampco Pittsburgh Corp.*, 903 F.3d 58 (3d Cir. 2018), the plaintiffs, a retired union employee and his former local union, sought to compel arbitration of their claim for retiree healthcare benefits. *Id.* at 60-61. In support of their argument, plaintiffs argued that while the CBA itself did not govern retiree health benefits, a particular section of the CBA "implicitly incorporates the MOA, which *does* discuss retiree health benefits." *Id.* at 63 (emphasis in original).

The court rejected this argument on several critical grounds. First, the court concluded that "[e]ven assuming Section 19's reference to 'Medical Insurance' includes retiree health benefits as well as the 'new health plan' for current employees, this single mention is insufficient to incorporate the MOA on the subject of retiree healthcare into the CBA." *Id.* (Internal citation omitted).

The Court proceeded to observe that, to the contrary, other language in the CBA expressly incorporating other agreements "[i]f anything, . . . suggests an intent *not* to incorporate the MOA. . . ." *Id.* at 64 (emphasis in original). The parties' specific and affirmative incorporation of other side agreements into the CBA, the court concluded, "makes clear that the parties to the CBA knew how to incorporate other agreements into the CBA, so ***it's telling that they chose not to use the same language in Section 19.***" *Id.* (Emphasis added).

Finally, the court identified another consequence of the non-incorporation of the relevant MOA: that the union was precluded from "invoke[ing] the presumption of arbitrability to salvage its position." *Id.* The court summarily concluded that while the CBA had an arbitration clause, "***the MOA—the contract under which this dispute actually arises, does not.*** And where there is no arbitration clause, the presumption does not apply." *Id.* (Emphasis added). Given these

considerations, the court concluded that the lower court erred in granting the union's motion to compel arbitration. *Id.* at 65.

The facts in *Cup* are analogous to the present facts, and consideration of the same facts militates reaching the same conclusion that the Third Circuit reached. With respect to the first consideration: the facts in *Cup* are akin to a hypothetical situation in which the Framework Agreement were identified by name in the CBA. As described at length above, it is not. And, under *Cup*, even if it were, that would still be insufficient for it to be incorporated in the CBA. *See Cup*, 903 F.3d at 63.

The *Cup* court's second conclusion lends even more aggressively to the conclusion that the underlying dispute here is not arbitrable. As in *Cup*, the Parties took affirmative steps to incorporate specific side agreements into the CBA, and collectively prepared an exhaustive list of side agreements to remain in effect during the term of the 2021-2024 CBA in the Appendix. (Dkt. No. 38-2.) Indeed, the Parties went so far as to identify in the Appendix which side agreements' continued application was in *dispute* between the Parties. *Id.* By mutual design, the Appendix does not include the Framework Agreement, nor does it include the Arbitration Award or the Arbitration Order. And, as borne out in *Cup*, because the Framework Agreement is not incorporated into the arbitration clause-bearing 2021-2024 CBA, the Framework Agreement (which itself does not contain an arbitration clause) is not subject to the presumption of arbitrability. *Cup*, 903 F.3d at 63.

## IV.    CONCLUSION

Put simply, Local 29 seeks to arbitrate the application of the Framework Agreement to plan year 2022 even though the Framework Agreement was extinguished in October 2021. Neither the Framework Agreement nor the 2021 Arbitration Award are incorporated, by reference or otherwise, in the CBA or as a side agreement. And, in fact, the Parties affirmatively

and deliberately extinguished the Framework Agreement through their negotiation of the side agreement identified in the Appendix and the zipper clause in Article XII. The underlying dispute does not arise out of any provision of the CBA and, lacking its own arbitration clause, the Framework Agreement (which has been extinguished for over two-and-a-half years) is not entitled to a presumption of arbitrability. Like the plaintiffs in *Cup*, Local 29 here "[w]ith the benefit of hindsight . . . now tries to reverse-engineer the requisite intent to incorporate. . ." these extra-contractual documents. *Id.* at 64. Both the facts and the law reject this outcome.

For the foregoing reasons, Energy Harbor respectfully requests that this Court grant summary judgment in Energy Harbor's favor on Local 29's sole claim seeking arbitration of the underlying Grievance.

Respectfully submitted,

/s/W. Eric Baisden
W. Eric Baisden, (OH 0055763)
Eric M. Flagg (OH 0099724)
**BENESCH, FRIEDLANDER,**
 **COPLAN & ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone:  216.363.4500
Facsimile:  216.363.4588
Email:  ebaisden@beneschlaw.com
        eflagg@beneschlaw.com

*Attorneys for Defendant Energy Harbor*
*Nuclear Corporation*

20

24116143

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing *Memorandum in Support of Defendant Energy Harbor Nuclear Corporation's Motion for Summary Judgment* was filed electronically on March 22, 2024, in accordance with the Court's Electronic Filing Guidelines. Parties may access this filing through the Court's Filing System.

*/s/ W. Eric Baisden*
*One of the Attorneys for Defendant Energy Harbor Nuclear Corporation*

21

24116143